IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

       v.                                09-CR-6030(CJS)

JASON E. TUTTY,
              Defendant.
————————————————————————————

## GOVERNMENT'S MEMORANDUM IN SUPPORT
## OF THE APPLICATION OF GUIDELINES

THE UNITED STATES OF AMERICA, by and through its attorneys, William J. Hochul, Jr., United States Attorney for the Western District of New York, Craig R. Gestring, Assistant United States Attorney, of counsel, hereby submits the Government's Sentencing Statement in the above-entitled case.

## Statement of Facts

On February 10, 2009, defendant Jason Tutty appeared before this Court and pled guilty to a single count of receiving child pornography, in violation of Title 18, United States Code, Section 2252A(a)(2). The parties agreed to the application of all but one enhancement in the plea agreement. The Presentence Report (PSR) recommended a guideline range of imprisonment of 168 to 210 months consistent with that advocated by the government in the plea agreement. On June 17, 2009, the defendant was sentenced to 168 months imprisonment and the defendant appealed.

On June 14, 2010, the Second Circuit Court of Appeals vacated defendant Tutty's sentence and remanded the case back to the District Court for re-sentencing.  This memorandum is submitted in opposition to defendant's motion that this Court should impose a sentence below the applicable Guidelines range set out by the parties in the plea agreement.

## **DISCUSSION**

### 1.    **The   Sentencing   Guidelines   Under   U.S.S.G. §2G2.2 Are Reasonable**.

The defense incorrectly relies upon <u>United States v. Dorvee</u>, 604 F.3d 84 (2nd Cir. 2010) to say that Guideline Section 2G2.2 is per se unreasonable.  To begin, Defendant's characterization of the holding in <u>Dorvee</u> is inaccurate.  The Second Circuit did not find the defendant's sentence in that case unreasonable based, even in part, on the "flawed development" of 2G2.2, as Defendant suggests. Instead, in <u>Dorvee</u>, the Second Circuit vacated the defendant's sentence and remanded for resentencing based upon two separate findings.  The first finding was that district court failed to properly calculate the applicable Guideline range.  This finding was based on the fact that despite the statutory maximum sentence being 240 months for the lone count to which the defendant pleaded guilty, the district court repeatedly referred to the applicable

2

range as between "262 and 327 months." Id. at 91-92.

Second, the Dorvee court concluded, based upon the facts of the case, that a sentence of 240 months was a substantively unreasonable sentence for that defendant.   In reaching that conclusion, the panel in Dorvee was troubled by the district court's "apparent assumption that [the defendant] was likely to actually sexually assault a child" – which it described as a "view unsupported by the record evidence" – in ruling that a 240 month sentence was required to afford adequate deterrence to criminal conduct under 18 U.S.C. Section 3553(a)(2)(B) Id. at 94.

The panel noted that the district court failed to provide any "reason why the maximum sentence of incarceration was required to deter [the defendant] and offenders with similar history and characteristics." Id. at 95.  And finally, the panel wrote that it was "troubled" that the district court "seems to have considered it a foregone conclusion that the statutory maximum sentence 'probably would be upheld' on appeal, apparently because it concluded that its sentence was 'relatively far below' the [inaccurate] Guidelines calculation of 262 to 327 months." Id. (quoting the statements of the district court during the sentencing hearing).   Thus, the defendant's sentence in Dorvee was ultimately reversed because of several errors made by the district court at sentencing both in stating the applicable Guideline range and in applying 18 U.S.C. Section 3553(a).

After those bases for the court's ruling are explained in the decision, the Second Circuit panel went on to criticize Guideline Section 2G2.2, beginning with describing it as "fundamentally different from most" and one which "unless applied with great care, can lead to unreasonable sentences that are inconsistent with what [Section] 3553 requires." See Id. at 95-98.  Of course, that language and the similar analysis that follows in the opinion (much of which is lauded in Defendant's filings) appears to be dicta. After all, the Second Circuit did not vacate and remand the defendant's sentence in Dorvee due to any of the supposed shortcomings of Guideline Section 2G2.2; to the contrary, the sentence was vacated and remanded for re-sentencing based upon the district court's reference to the wrong applicable range and his apparent misunderstanding of the evidence presented.

The defense suggest that this Court take the position adopted by some district courts across the country that the Guidelines embodied by U.S.S.G. § 2G2.2 lack an empirical basis and therefore should be given substantially less weight at sentencing.  Many of the decisions taking this viewpoint articulate a line of reasoning that is most fully developed in an article first published in June 2008 by Assistant Federal Defender Troy Stabenow, entitled "Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines" ("Stabenow").

Stabenow's main arguments are that the various Congressional

4

statutes and the Sentencing Commission's amendments to the Guidelines increasing the sentences for possession of child pornography were not based on empirical data, were pushed by religious organizations and were tacked onto well-received statutes concerning child protection without receiving a full congressional debate.

    a.    **The Notion of Whether or Not Empirical Basis Exists for Guidelines Does Not Belong in the Realm of the <u>Courts</u>.**

In creating the Sentencing Commission, Congress gave explicit instructions to the Commission and retained for Congress the role of directing and overseeing the Commission's efforts.  Congress set the goals for sentencing, 18 U.S.C. § 3553(a)(2), and instructed the Commission to assure that they were met, 28 U.S.C. § 991(b), by promulgating Guidelines that promote those Congressional purposes, especially "providing certainty and fairness in sentencing and avoiding unwarranted sentencing disparities."

As the Supreme Court has noted:

The Commission's work is ongoing.  The statutes and the Guidelines themselves foresee continuous evolution helped by the sentencing courts and courts of appeals in that process.  The sentencing courts, applying the Guidelines in individual cases may depart (either pursuant to the Guidelines or, since <u>Booker</u>, by imposing a non-Guidelines sentence).  The judges will set forth their reasons.  The Court of Appeals will determine the reasonableness of the

resulting sentence. The Commission will collect and examine the results. In doing so, it may obtain advice from prosecutors, defenders, law enforcement groups, civil liberties associations, experts in penology, and others. And it can review the Guidelines accordingly. See generally, 28 U.S.C. 994 (p) and note following 994 (Commission should review and amend Guidelines as necessary and Congress has power to revoke or amend Guidelines); Mistretta v. United States, 488 U.S. 361, 393-394, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); USSG 1B1.10(c)(listing 24 amendments promulgated in response to evolving sentencing concerns); USSG 1A1.1, comment.

The result is a set of Guidelines that seek to embody the 3553(a) considerations both in principle and in practice. Given the difficulties of doing so, the abstract and potentially conflicting nature of 3553(a)'s general sentencing objectives, and the differences of philosophical view among those who work within the criminal justice community as to how best to apply general sentencing objectives, it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve 3553(a)'s objectives.

Rita v. United States, 551 U.S. 338, 350-351 (2007).

In Kimbrough v. United States, 128 S.Ct. 558 (2007), the Supreme Court considered and rejected the assertion of some courts that the crack cocaine Guidelines were an exception to the advisory nature of the Guidelines because Congress had directed courts and the Commission to follow the 100 to 1 ratio. The Court rejected that argument, not because Congress could not do so, but because it had not done so.

The Supreme Court then proceeded to review the sentence before it. The Court noted that despite changing the nature of the Guidelines from mandatory to advisory, United States v. Booker, 543

U.S. 220 (2005), nevertheless "preserved a key role of the Sentencing Commission."   Kimbrough, 128 S.Ct. at 574.

> Congress established the Commission to formulate and
> constantly refine national sentencing standards.
> Carrying out its charge, the Commission fills an
> important institutional role: It has the capacity courts
> lack to "base its determinations on empirical data and
> national experience, guided by a professional staff with
> appropriate expertise."
>
> We have accordingly recognized that, in the ordinary
> case, the Commission's recommendation of a sentencing
> range will "reflect a rough approximation of sentences
> that might achieve 3553(a)'s objectives."   Id. at 574
> (citations omitted).

The Kimbrough decision noted that the Sentencing Commission has an institutional advantage over judges and as a result, "in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of snetneces that might achive 3553(a)'s objectives," while the sentencing judge is in a superior position to determine the import under 3553(a) of the particular facts of a case.   Id. at 574-575.

> In light of these discrete institutional strengths, a
> district court's decision to vary from the advisory
> Guidelines may attract greatest respect when the
> sentencing judge finds a particular case "outside the
> heartland" to which the Commission intends individual
> Guidelines to apply."
>
> On the other hand, while the Guidelines are no longer
> binding, closer review may be in order when the
> sentencing judge varies from the Guidelines based solely
> on the judge's view that the Guidelines range "fails
> properly to reflect 3553(a) considerations" even in a
> mine-run case.   Id. at 575.

The Supreme Court then proceeded to analyze the crack cocaine guidelines and determined that those Guidelines did not exemplify the Commission's exercise of its characteristic institutional role because (1) in setting the Guidelines the Commission merely looked at the mandatory minimum sentences set in the 1986 Act and failed to take account of empirical data and national experience, even though it had not been directed by Congress to do so, and (2) the Commission itself recognized the disparity and attempted to achieve a reduction in the crack/powder ratio by proposing amendments.  Id. at 575, 576, 570-573.

Kimbrough has spawned a line of argument from critics of the § 2G2.2 Guidelines that the guidelines are not reasonable because they are not empirically based.  Indeed, according to the critics, now a sentencing court must first consider, before applying a Guideline, whether that Guideline embodies the Commission's exercise of its characteristic institutional role.  By parsing out statements concerning empirical data from Kimbrough, Stabenow and his followers ignore the extraordinary and unique history of the crack/powder ratio that led the Court to find that sentencing courts could conclude that the crack/powder disparity led to sentences "'greater than necessary'" to achieve 3553(a)'s purpose even in a mine-run case."  They further ignore the Supreme Court's reaffirmation that the Commission properly bases its Guidelines not merely on empirical data collected but also on congressional

directives.  Finally, the critics conveniently ignore the <u>Kimbrough</u> Court's conclusion that "in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve 3553(a)'s objectives." <u>Id.</u> at 574.

Whether or not the child pornography guidelines reflect the expertise of the Sentencing Commission, "it is the perogative of Congress to fix the sentence for a federal crime and the scope of judicial discretion with repsect to a sentence." <u>United States v. Kirchhof</u>, 505 F.3d 409 (6th Cir. 2007).  <u>See also</u>, <u>United States v. Clawson</u>, 303 Fed.Appx. 861, 863 (11th Cir. 2008).  Even if § 2G2.2 is the product of congressional direction rather than an empirical approach, "in the real-world circumstance where a sentencing judge agrees with Congress, then the resulting sentence is probably within the range of reasonableness."  <u>United States v. Kiderlen</u>, 569 F.3d 358, 369 (8th Cir. 2009).

Despite the fact that the Guidelines are the product of both the Commission's empirical analysis and congressional directives, the critics contend that the Guidelines are merely the product of congressional directives and not past sentencing practices. Stabenow and his followers overlook the 30-year history behind 2G2.2 and the studies and revisions which have led to the current iteration of the Guidelines pertaining to crimes involving child exploitation.  Instead, they attempt to minimize the harm caused by

those who possess, trade, distribute and download these images by characterizing defendants as merely passive viewers of the crimes of others.  According to the critics, the guidelines far exceed the seriousness of the crime "committed by the typical offender who is swapping and downloading child porn online with other like-minded individuals in the presumed privacy of his own home." Hansen, Mark. A Reluctant Rebellion, ABA Journal, June 2009, at 56.

The critics fail to understand that, fundamentally, it is not possible to disconnect the collection, trade, viewing the possession of images of children being sexually abused from their production.  Every defendant who receives sexually abusive images of children is not acting within the four corners of his home but rather is a participant in a global market with millions of members – a market which constantly demands that more children be abused to create new images.

In no other area are attacks on the Guidelines primarily premised on this notion of a lack of empirical basis.  At its heart, these attacks come from a misapprehension as to the harm that is caused by the dissemination of images of child sexual abuse.  The distribution, receipt, viewing and possession of child pornography is a distinct and egregious form of child exploitation worthy of punishment in and of itself.  Children are exploited by the collection of their images. As "like-minded individuals" trade in these images, they reinforce the concept that a sexual

10

attraction to children is normal and acceptable.  As they establish contacts and networks to facilitate the trade and discussion of these images, they contribute to the market demands for more product.  Unlike drugs, the product being disseminated cannot be considered to be a typical fungible good because the product involves the memorialization of the sexual abuse of a child.

Critics and courts that attempt to distinguish those who view the images from those who are actual child molesters claim that the threat from those who possess, distribute and receive images of children being sexually abused is actually minimal.  According to critics, these defendants are not a danger to society in that these are images that are collected merely for their own personal gratification and titillation.  This view comes from a blatant misapprehension of the true nature of these images that depict the sexual abuse of children.

In the 1970s and 80s, the typical images of the sexual abuse of children involved photos of nude children in sexual poses or what could be categorized as the "lascivious exhibition of the genitals or pubic area."  However, over time, increasingly severe and graphic images have started to become the norm instead of the exception, depicting the violent sexual abuse of younger and younger children, including toddlers and infants.

While there are some who suggest that the collection, trade and possession of such images have been made illegal because of

"polite society's disgust and revulsion" with pornography, or "[o]ur 'social revulsion' against these 'misfits,'" United States v. Paull, 551 F.3d 516, 533 (6th Cir. 2009) (Merritt, J. dissenting), the heart of a case involving images depicting the sexual abuse of children is not Victorian-era discomfort with sex, but with the sexual exploitation of children through the on-going mass circulation of images of their abuse. "It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling...[and that] the use of children as subjects of pornographic materials is harmful to the physiological, emotional and mental health of the child." New York v. Ferber, 458 U.S. 747, 756-758 (1982).

Stabenow and his followers argue that the Guidelines are empirically baseless because Section 2G2.2 really is an attempt to punish those who physically harm children as opposed to those who do not. Indeed, courts that have imposed below-guidelines sentences in distribution, receipt, or possession cases tend to do so almost exclusively where there is no evidence that the defendant has engaged in any form of child exploitation other than through the collection of images, that is, in cases where defendants distributed, received, viewed or possessed child pornography but had not enticed or molested a child. In contrast, in cases where the defendant both collected child pornography images and molested

12

children, little to no criticism is heard that child pornography guidelines are nothing more than an excessive reaction caused by simple revulsion.

Thus, when Stabenow and his followers criticize the purported empirical basis of the child pornography trafficking guidelines, the criticism is directed on the legitimacy of the crime in the first instance.  This reality becomes clear when courts impose the lowest possible sentence.  A disagreement with the guidelines at the margins is one thing but a wholesale disregard for every and all recommended aggravating factors is quite another.  Courts which resolve their "disagreement" with the substance or basis of the guidelines but by ignoring their content completely are not asking when "enough is enough" but rather are revealing a fundamental disagreement with the crime or a lack of understanding of these defendants.

With regard to the Guidelines calculations themselves, the substance of § 2G2.2 is imminently sound.  In the simplest terms, the base offense level rises from an offense level of 18 for simple possession cases (27-33 months), to 20 for receipt without intent to distribute (33-41 months), and to 22 for other receipt and distribution cases (41-51 months).  Anticipating that certain specific offense characteristics would apply in most cases, the Sentencing Commission set the base offense level as for receipt and distribution cases well below the mandatory minimum term of five

13

years.

### b. The guideline enhancements set out in the plea agreement and pre-sentence investigation report should be applied.

The defense now argues that since the enhancements for possession of images of minors under 12, use of a computer, and the number of images applies in nearly all cases, that this Court should simply disregard them. This argument is flawed and without merit.

First, the defendant specifically agreed to the application of these enhancements within the plea agreement signed and filed in February of 2009. Further, the defendant reaffirmed the application of these enhancements in the introduction to his June 2009 sentencing statement;

> "The government and Mr. Tutty agree that the following specific offense characteristics apply: (a) two level increase because the material involved a minor under the age of 12 years; (b) the five level increase because the case involved distribution for other than pecuniary gain; (c) a two level increase for use of a computer; and (d) a three level increase for possession of between 150 and 300 images."

(See page 2 of the defendants Sentencing Statement, 6/2/09) The defendant cannot now simply request that this Court disregard these enhancements when determining the appropriate sentence.

Second, the concept that underpins the number and type of images enhancement is not novel. The drug, explosives, and gun

14

guidelines also provide for higher sentences based on the volume and type of contraband involved and the fraud and theft guidelines recommend higher sentences in cases with larger losses.  See, U.S.S.G. § 2D1.1 (drugs), § 2D1.11(chemicals), § 2K1.3 (explosive materials), § 2K2.1 (guns and ammunition), § 2B1.1 (fraud). § 2B2.1(burglary).  It is only logical, therefore, and consistent with other guidelines, to hold this defendant accountable for both the quantity of images involved and the age of the children and degree of violence depicted.

With regard to the use of computer enhacement, it is true that this enhancement applies in nearly every case. However, the Commission anticipated this and established a lower base offense level to account for this:

> The Commission determine that a base offense level of 22 is appropriate for trafficking because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g., use of a computer, material involving children under 12 years of age, number of images), the mandatory minimum of 60 months' imprisonment will be reached.

See, Amendment 664, U.S.S.G. App. C.  Thus, the Commission negated any impact that would be caused by the frequent application of these circumstances when it established the base offense level for the crimes.

Nothing in the guidelines increases a defendant's sentence based on a prediction of future dangerousness.  Each specific offense characteristic is clearly tied to what the defendant

actually did – not what he will do – in the commission of the instant offense.   Moreover, to those who accuse the guideline enhancements within § 2G2.2 of containing overlap, it is hard to see the substantive overlap between enhancements based on the degree of violence in the images, the age of children, the size of the collection, the nature of the distribution and the defendant's prior illegal activity.

   2.   **This Court Should Impose a Sentence Within the Advisory Guidelines Range Contemplated in the Plea Agreement (168 to 210 months)**.

The United States recognizes that since <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory rather than statutorily mandated.   However, when imposing a sentence, the Court is required to consider the guidelines, but must fashion a sentence that is consistent with the factors detailed in 18 U.S.C. § 3553(a).   The United States contends the sentencing guideline range in this case is reasonable and appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).

Under Section 3553(a), the sentence imposed must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. See 18 U.S.C. § 3553(a). The sentencing court must also consider "the need to avoid unwarranted sentencing disparities

16

among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  A court that imposes a sentence outside the applicable advisory Guidelines range must do so on notice to the parties and must state "with specificity" both at sentencing and in the written judgment and commitment order its reasons for doing so.  18 U.S.C. § 3553©.

In Considering the §3553(a) factors, this Court should conclude that the Sentencing Guidelines provide the proper punishment for the offense of conviction. While Tutty now requests a reduced non-Guidelines sentence, the government objects to such a sentence as unreasonable given the § 3553(a) factors.

### a.   __Impact on the Victims in this Case__.

While no doubt the incarceration of the defendant will dramatically impact him, this impact is minor when contrasted with the massive harm to both society and more importantly, the victims least able to protect themselves: the children depicted in the pornographic images consumed by the defendant.

In a child pornography possession case such as this one, the primary __victims__ are the children depicted.  <u>United States v. Shutic</u>, 274 F.3d 1123, 1126 (7th Cir. 2001); <u>United States v. Sherman</u>, 268 F.3d 539, 547-48 (7th Cir, 2001).  As the <u>Sherman</u> Court noted, "child pornography directly victimizes the children

17

portrayed by violating their right to privacy." Id. As the Court noted in Shutic, "children . . . suffer profound emotional repercussions from a fear of exposure, and the tension of keeping the abuse a secret . . . . concern for the welfare of the children who are used to create pornography is part of the public concern over child pornography." Shutic, at 1126. (citations omitted).

While it is true that there is no evidence that Tutty was involved in any production of child pornography, his crime is still considered to not only promote the production of such materials, but to also continue the harm to the children.  Child pornography appears to know no bounds, and violators come from all types of seemingly unsuspecting individuals.  Case law has recognized that even a "'passive' consumer who merely receives or possesses the images directly contributes to this continuing victimization." Sherman, 268 F.2d at 545 (citations omitted).  "Indeed, one of the reasons for criminalizing the 'mere' possession of child pornography is to create an incentive for the possessor to destroy the material, and alleviate some of these harms to the children depicted." Sherman, 268 F.3d at 547.  Here, as noted in the PSR, defendant possessed child pornography involving a known child victim series.  PSR at ¶ 30.  This is a real child, and this Court has before it a victim impact statement, detailing the devastating effects on the victim resulting from the possession and continued trading of the images of abuse.

18

b.   **The History and Characteristics of the Defendant do
not merit a reduced sentence**.

The record clearly demonstrates that defendant took steps to
actively receive <u>and</u> distribute images of child sexual abuse.  <u>See</u>,
PSR ¶ 20.   Far from constituting some innocuous gesture, the
government views such behavior as another step down the path toward
a child abuser.

The government notes that the Sentencing Commission has made
it clear that child sex crimes under Chapter 110 are to be treated
differently than other types of crimes.   <u>See</u> §5K2.13 (may not
depart based on diminished capacity); §5K2.20 (may not depart based
on aberrant behavior).

Because diminished capacity and  aberrant behavior are factors
expressly prohibited by the Sentencing Commission as grounds for
departure, for this Court to consider them would be inconsistent
with the requirement of 18 U.S.C. § 3553(a)(5) that, in imposing
sentence, this Court consider any pertinent policy statement issued
by the Sentencing Commission pursuant to section 994(a)(2) of Title
28, United States Code.   <u>See</u> <u>United States v. Lorenzo</u>, 471 F.3d
1219, 1221 (11th Cir. 2006) (a sentence based solely upon an
impermissible factor is unreasonable because the sentence does not
achieve  the  purposes  of  section  3553(a); <u>United  States  v.</u>
<u>Ratoballi</u>, 452 F.3d 127, 134 (2nd Cir. 2006)("A non-Guidelines

sentence that a district court imposes in reliance on factors incompatible with the Commission's policy statements may be deemed substantively unreasonable...".). Accordingly, this Court may not consider, as a basis for mitigation under section 3553(a), any argument that defendant's conduct was the result of diminished capacity or aberrant behavior, because the resulting sentence would be unreasonable.

Thus, the history and characteristics of the defendant weigh in favor of a term of incarceration within the Guidelines range. 18 U.S.C. § 3553(a)(1). Here, the advisory Guidelines range, represents an appropriate range of incarceration for the offense of conviction. Indeed, a lesser sentence would fly in the face of both Congress' and the Sentencing Guidelines Commission's judgments that child pornography offenses should be treated *more* harshly, rather than less. 18 U.S.C. § 3553(a)(4).

The non-Guidelines sentence requested by the defendant would place him in the same position as defendants charged with much less serious offenses. It would result in unwarranted sentencing disparity between this defendant and most if not all other individuals who have been prosecuted for possessing similar quantities and types of child pornography as the defendant. As such, the need to avoid unwarranted sentence disparities clearly weighs in favor of a Guidelines sentence. 18 U.S.C. § 3553(a)(6).

In addition, to the extent that defendant's submission might

be read to suggest that a downward variance might be warranted on the grounds that there is no evidence that the defendant had produced child pornography or actually had touched a child inappropriately, the government respectfully submits that such claim should be rejected.  Indeed, the absence of such factors does not take the case out of the heartland of possession of child pornography cases.[1]

> Goff has attempted to downplay the nature and seriousness of his crime, arguing in his brief that he was simply a "curious, casual user" of the child pornography website, and implying that his was a victimless crime because viewing the pornography was 'a solitary, private activity of short duration driven by Mr. Goff's curiosity of the subject."
>
> * * *
>
> The briefest of forays into Goff's on-line fantasy world gives the lie to his cant about "solitary" activities and exposes the basic flaw in the District Court's implied conclusion that nothing wrong was going on here except in Goff's mind.
> * * *
> Children are exploited, molested and raped for the prurient pleasure of Goff and others who support suppliers of child pornography.  These small victims may rank as "no one else" in Goff's mind, but they do indeed exist outside his mind.  Their injuries and the taking of their innocence are all too real.  There is nothing "casual" or theoretical about the scars they will bear from being abused for

---

[1]By analogy, in a case involving a bank robbery, it would be unreasonable to grant a variance under section 3553(a) because the defendant did not use a gun during the commission of the offense.

21

> Goff's advantage.  Far from persuading us that
> Goff's crime was relatively minor, his efforts
> to downplay the harm his actions have
> inflicted on others serve chiefly to highlight
> the concern the District Court should have had
> with Goff's failure to appreciate teh
> seriousness of his offense."

United States v. Goff, 501 F.3d 250, 258-259 (3rd Cir. 2007).


Finally, with regard to defendant's argument that he is a criminal history category I, again, Goff is instructive:

> Despite his arguments implying the contrary, Goff's
> criminal history, in Category I, is similar to the vast
> majority of those convicted for possession of child
> pornography.  In fact, in the U.S. Sentencing
> Commission's Final Report on the Impact of United
> States v. Booker On Federal Sentencing, March 2006,
> Table 18 (available at
> http://www.ussc.gov/booker_report/Booker_Report.pdf),
> the Commission reported that in post-Booker sentencing
> of those convicted of possession of child pornography,
> 332 out of 387 total offenders had a Criminal History
> Category of I.  Thus Goff is no outlier; he is, on the
> contrary, plainly in the "heartland" of offenders.
> Goff, 501 F.3d at 261.


As there is nothing about this case that significantly differentiates it from other child pornography cases, a variance would fail to adequately take into account Congress's stated intent to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

## CONCLUSION

For the reasons specified herein, the defendant's request for a non-guidelines sentence should be denied.

DATED: Rochester, New York, November 9, 2010.

Respectfully submitted,

WILLIAM J. HOCHUL, Jr.
United States Attorney

BY:  /s/ Craig R. Gestring
     CRAIG R. GESTRING
     Assistant U.S. Attorney
     WESTERN DISTRICT OF NEW YORK
     100 State Street
     Rochester, New York  14614
     (585)263-6760, ext. 2279
     Craig.Gestring@usdoj.gov